FILED
04/20/2022
Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 6, 2021 Session[1]

## STATE OF TENNESSEE v. WILLIAM EUGENE MOON

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Coffee County**
**No. 44,905F  L. Craig Johnson, Judge**

———————————————————

### No. M2019-01865-SC-R11-CD

———————————————————

William Eugene Moon ("Defendant") was convicted of attempted second degree murder and unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony. Defendant appealed his conviction and asserted, among other things, that he had been denied the right to a speedy trial and that the trial court erred by allowing improper impeachment of a defense witness. The Court of Criminal Appeals affirmed the judgments of the trial court, holding that Defendant was not denied a speedy trial and, although the trial court erred in allowing the prosecution to improperly impeach a defense witness, the error was harmless.  This Court granted Defendant's application for permission to appeal to consider whether the Court of Criminal Appeals applied the proper standard of review to Defendant's claim that he was denied a speedy trial, to address the merits of Defendant's speedy trial claim, and to determine whether the trial court committed reversible error in allowing improper impeachment of a defense witness. We hold that the standard of review for an alleged speedy trial violation is de novo with deference to the trial court's findings of fact unless the evidence preponderates otherwise. When reviewed under this standard, we determine that the Court of Criminal Appeals properly held that the Defendant was not denied a speedy trial. Further, we agree with the intermediate court that the trial court erred in allowing improper impeachment of a defense witness. However, we hold that this error was not harmless and is reversible error. Accordingly, we reverse the judgment of the Court of Criminal Appeals and vacate the judgments of the trial court. The case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed; Judgments of the Trial Court Vacated; Case Remanded to Trial Court**

———

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

ROGER A. PAGE, C.J., delivered the opinion of the court, in which SHARON G. LEE, JEFFREY S. BIVINS, and HOLLY KIRBY, JJ., joined.

Paul Andrew Justice, III, Murfreesboro, Tennessee, for the appellant, William Eugene Moon.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Sophia S. Lee, Senior Assistant Attorney General; Benjamin A. Ball, Senior Assistant Attorney General; Samantha L. Simpson, Assistant Attorney General; Craig Northcott, District Attorney General; and Jason Ponder, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2017, Corporal Michael Wilder[2] was on patrol near apartments he previously searched for drug trafficking when he saw a black sports utility vehicle with spray-painted windows. Corporal Wilder drove by the vehicle and observed four individuals he believed to be avoiding him. He parked in a side alley and watched the vehicle, noticing the occupants entering and exiting the vehicle to walk to a trailer park on the other side of the road. Corporal Wilder considered this to be strange behavior and drove through the trailer park "to figure out what [was] going on." At the trailer park, Corporal Wilder observed several people outside, including one man who lowered his head and ran up to a trailer when he saw Corporal Wilder approaching.

Corporal Wilder spoke with Larry Woods, an employee of the trailer park,[3] outside of Mr. Woods' trailer. Corporal Wilder asked Mr. Woods who was inside the trailer, and Mr. Woods told Corporal Wilder it was Defendant. Corporal Wilder asked Mr. Woods to retrieve Defendant from the trailer, and Mr. Woods complied. Defendant emerged from the trailer, standing atop a set of steps. Corporal Wilder believed Defendant appeared "fidgety" and "nervous" and that Defendant's breathing "start[ed] to pick up." To Corporal Wilder, these were signs of "evasion" or "possible violence." Corporal Wilder noticed a plastic bag inside Defendant's mouth that he believed contained methamphetamine. He instructed Defendant to spit out the plastic bag, and a tussle ensued between Corporal Wilder and Defendant. Precisely what happened during that conflict is at the core of this case.

---

[2] At the time of the incident, Michael Wilder was senior corporal on day shift and acting sergeant for the Tullahoma Police Department. At the time of trial, he had transferred to the Manchester Police Department. For clarity, we will refer to him as "Corporal Wilder" throughout this opinion.

[3] The record is unclear as to whether Larry Woods was the manager or maintenance man at the trailer park.

According to Corporal Wilder, Defendant began cursing and actively fighting against him. Corporal Wilder testified that, during the scuffle, Defendant pulled a gun and held it against Corporal Wilder's abdomen. Corporal Wilder tried to get the gun away from Defendant. He believed Defendant was attempting to use deadly force against him. According to Corporal Wilder, as a "last resort" he pushed Defendant back and shot at him.

Defendant's version of events differs substantially. While he admitted he had a gun in the waistband of his pants that day, Defendant insisted he did not fight against Corporal Wilder and he never took the gun out. Rather, Defendant claimed that the gun fell out of his pants and underneath him after Corporal Wilder shot him.

It is undisputed that Corporal Wilder shot Defendant five times. Defendant was transported to a hospital in Alabama for medical treatment, and his arrest warrant was issued by the General Sessions Court on December 21, 2017, while he was still hospitalized. The record indicates that Defendant was served with the warrant for his arrest and incarcerated in Tennessee on January 24, 2018.

On April 10, 2018, Defendant was indicted for attempted first-degree murder, resisting arrest, aggravated assault, and two counts of unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony. He was arraigned in circuit court on April 17, 2018. At a court appearance on May 9, 2018, he requested a trial date. On May 23, 2018, the trial court set the trial for November 28, 2018. As the trial date approached, the State moved for a continuance due to a scheduling conflict with a multi-day rape trial that had been pending for three years. Defendant opposed the motion, but the trial court reset his case for February 1, 2019. On January 16, 2019, Defendant filed a motion to dismiss the charges against him for violation of his right to a speedy trial.[4] The trial court issued a written order denying Defendant's motion to dismiss on February 7, 2019. Thereafter, the trial court sua sponte moved the trial to February 11, 2019, to allow Defendant's trial to proceed over three consecutive weekdays.

Before the trial began, the State moved to dismiss three counts of the indictment: Count 2 (resisting arrest), Count 3 (aggravated assault), and Count 4 (one count of unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony). Thus, the trial proceeded against Defendant on Count 1 (attempted first-degree murder), and Count 5 (unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony). The trial began on February 11, 2019, and concluded on February 14, 2019.

---

[4] Defendant previously filed a "Demand for Speedy Trial" in General Sessions Court.

In addition to Defendant and Corporal Wilder, the court heard testimony from several other law enforcement officers and eyewitnesses.[5] Most notably, and relevant to the issues presented on appeal before this Court, the State called as a witness Detective Karl Pyrdom. Detective Pyrdom testified that he arrived at the scene after Officer Wilder called for backup. He arrived in time to see a "scuffle," and ran toward the trailer. He heard Corporal Wilder shouting instructions but did not hear him tell Defendant to drop a weapon. He stated that he could not see either party's hands and that he could not see Defendant holding a weapon. After gunshots were fired, Detective Pyrdom was instructed by Officer Wilder to "get that gun," and Detective Pyrdom testified that he picked up a weapon that he saw on the ground at the foot of the steps to the trailer.

The defense, in turn, called eyewitness Larry Woods. Mr. Woods described witnessing the altercation from close range. He emphasized that he did not see Defendant holding a gun and that, after Corporal Wilder shot Defendant, he did not initially see a gun on the ground. He later saw Detective Pyrdom kick a gun out from under Defendant, who was lying on the ground. Mr. Woods son, Donald, was also present at the scene and testified that he never saw a gun in Defendant's hand. In addition, J.J.,[6] a friend of Defendant's who was fourteen years old at the time of the incident, testified that he saw Defendant place a gun in his pants prior to the altercation with Corporal Wilder. He stated that he observed the altercation and that there was not a gun in Defendant's hands.

The jury convicted Defendant of the lesser-included offense of attempted second-degree murder and also convicted him of unlawful employment of a firearm during the commission of or attempt to commit a dangerous felony. The trial court sentenced Defendant to consecutive sentences of ten years for the attempted second-degree murder conviction and six years for the employment of a firearm conviction, for a total effective sentence of sixteen years imprisonment.

The Court of Criminal Appeals affirmed the judgments of the trial court. *See State v. Moon*, No. M2019-01865-CCA-R3-CD, 2021 WL 531308, at *1 (Tenn. Crim. App. Feb. 12, 2021), *perm. app. granted*, (Tenn. May 13, 2021). Relevant to this appeal, the intermediate appellate court concluded that Defendant's right to a speedy trial had not been violated. *Id.* at *20. The court determined that the delay was not unreasonable and that Defendant failed to establish he had been prejudiced by the delay. *Id.* at *19-*20. The intermediate court also declined relief to Defendant on his argument that "the trial court improperly permitted impeachment of defense witness Mr. Larry Woods with prior bad

---

[5] For a more thorough recitation of the facts, see the Court of Criminal Appeals opinion, *State v. Moon*, No. M2019-01865-CCA-R3-CD, 2021 WL 531308 (Tenn. Crim. App. Feb. 12, 2021), *perm. app. granted*, (Tenn. May 13, 2021).

[6] It is this Court's custom to use initials when referring to juvenile witnesses.

acts of alleged drug dealing." *Id* at *12. While agreeing with Defendant that the trial court admitted the impeachment evidence in error, the court found the error to be harmless and affirmed Defendant's convictions. *Id.* at *15.

We granted Defendant's application for permission to appeal to consider whether the Court of Criminal Appeals applied the proper standard of review to Defendant's claim that he was denied a speedy trial, to address the merits of Defendant's speedy trial claim, and to determine whether the trial court committed reversible error in allowing improper impeachment of defense witness Larry Woods.

## II. ANALYSIS

### A. Standard of Review for Violation of Right to Speedy Trial

Both the United States Constitution and the Tennessee Constitution guarantee criminal defendants the right to a speedy trial.[7] *See* U.S. Const. amend. VI; Tenn. Const. art. 1 § 9. Defendant argues that his Sixth Amendment right to a speedy trial was violated and the charges against him must be dismissed. As always, our analysis of an allegation of error is subject to a particular standard of review, but the parties here disagree on the proper standard of review to apply to an allegation of a speedy trial violation.

The State urges this Court to apply an abuse of discretion standard of review, which is consistent with the standard applied by the intermediate court in this case. *See Moon*, 2021 WL 531308, at *19. As the Defendant notes, however, it appears that the abuse of discretion standard of review may have arisen inadvertently. As support for its use of the abuse of discretion standard of review, the intermediate court cited *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005). *Hudgins* and another oft-cited Court of Criminal Appeals case *State v. Easterly*, 77 S.W.3d 226, 236 (Tenn. Crim. App. 2001), both refer back to the case of *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996) as the source of the standard of review. However, the intermediate court in *Jefferson* simply concluded that "the trial court did not abuse its discretion in finding that the appellant's right to a speedy trial had been violated" without citation. *See Jefferson*, 938 S.W.2d at 14. The State acknowledges "several unreported cases" have applied de novo review but faults those cases for improperly relying on *State v. Hawk*, 170 S.W.3d 547, 549 (Tenn. 2005), which did not analyze a speedy trial claim.

Defendant urges this Court to adopt a de novo standard of review and asserts that the majority of intermediate court panels have conducted a de novo review. *See, e.g.*, *State v. Hutchings*, No. M2008-00814-CCA-R3-CD, 2009 WL 1676057 at *5 (Tenn. Crim. App.

---

[7] Tennessee Code Annotated section 40-14-101 (2018) also provides a statutory right to a speedy trial that is not at issue in this appeal.

June 16, 2009); *State v. Watson*, No. W2004-00153-CCA-R3-CD, 2005 WL 659020, at *4 (Tenn. Crim. App. Mar. 22, 2005); *State v. Picklesimer*, No. M2003-03087-CCA-R3-CD, 2004 WL 2683743, at *2 (Tenn. Crim. App. Nov. 24, 2004) (explaining that the question regarding the right to a speedy trial is a mixed question of law and fact subject to de novo review). Defendant concedes, however, that a number of intermediate court panels have applied the abuse of discretion standard without noting the conflict in authority. *See, e.g.*, *State v. Crippen*, No. E2011-01242-CCA-R3-CD, 2012 WL 5397109, at *3 (Tenn. Crim. App. Nov. 6, 2012); *Hudgins*, 188 S.W.3d 663 at 667; *Easterly*, 77 S.W.3d 226 at 236; *Jefferson*, 938 S.W.2d 1 at 14.

Defendant further cites to cases from several federal circuits that have adopted the de novo standard of review, giving deference only to the trial court's view of the facts. *See, e.g.*, *United States v. Molina-Solorio*, 577 F.3d 300, 303-04 (5th Cir. 2009); *United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007); *United States v. Arceo*, 535 F.3d 679, 684 (7th Cir. 2008); *United States v. Aldaco*, 477 F.3d 1008, 1016 (8th Cir. 2007); *United States v. Sutcliffe*, 505 F.3d 944, 956 (9th Cir. 2007); *United States v. Schlei*, 122 F.3d 944, 986 (11th Cir. 1997). Defendant also suggests that the United States Supreme Court would conduct de novo review of all constitutional claims. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge*, ----U.S.----, 138 S.Ct. 960, 967 n.4 (2018) ("In the constitutional realm, for example, the calculus changes. There, we have often held that the role of appellate courts 'in marking out the limits of [a] standard through the process of case-by-case adjudication' favors *de novo* review even when answering a mixed question primarily involves plunging into a factual record." (alteration in original)).

In contrast, the State suggests that, although the United States Supreme Court has not explicitly announced a standard of review for speedy trial claims, the Court's analysis in *Barker v. Wingo*, 407 U.S. 514 (1972), indicates it would use discretionary review. Further, the State submits that the Court should adopt the abuse of discretion standard because Tennessee courts apply this standard to a trial court's decision to dismiss an indictment for pre- or post- indictment delay under Tennessee Rule of Criminal Procedure 48(b). *See State v. Benn*, 713 S.W.2d 308, 311 (Tenn. 1986).

After review, we agree with Defendant that de novo review is appropriate. More specifically, we conclude that the standard for appellate review of whether a criminal defendant was denied his constitutional right to a speedy trial is de novo review with respect to whether the court correctly interpreted and applied the law. The appellate court should give deference to the trial court's findings of fact unless the evidence preponderates otherwise. We determine this to be the most appropriate standard because, by nature, a speedy trial violation claim is a mixed question of law and fact. Many of the material facts required to analyze such claims are undisputed and require no discretion by the trial court. Determining whether such facts violate a defendant's right to a speedy trial is a question of law to be determined de novo by a reviewing court.

- 6 -

## B. Defendant's Speedy Trial Claim

Having determined the proper standard by which we review a speedy trial claim, we now turn to the merits of Defendant's assertion that his right to a speedy trial was violated.

The relevant undisputed facts in this case are as follows: After being shot on December 17, 2017, Defendant was transported to a hospital in Alabama to recover. He was charged in general sessions court on December 21, 2017, and held in an Alabama jail awaiting transport to Tennessee after his release from the hospital. On January 24, 2018, Defendant was transported to Tennessee and served with an arrest warrant charging him with attempted first-degree murder and resisting arrest. February 2, 2018, was Defendant's first court date in general sessions court, but the preliminary hearing was continued to March 8, 2018. On March 7, 2018, Defendant filed a motion for a speedy trial. At the preliminary hearing on March 8, 2018, Defendant was bound over to circuit court. On April 10, 2018, Defendant was indicted by the Coffee County Grand Jury for attempted first-degree murder, resisting arrest, aggravated assault, and two counts of possession of a firearm during the commission or attempt to commit a dangerous felony. Defendant was arraigned in circuit court on April 17, 2018. Defendant's trial was set for November 28, 2018, but on November 6, 2018, the State moved to continue the trial due to a scheduling conflict with a three-year-old rape case. The trial court granted the State's motion over Defendant's objection and rescheduled the trial for February 1, 2019. On January 16, 2019, Defendant filed a motion to dismiss the indictment due to the violation of his right to a speedy trial. On February 7, 2019, the trial court entered a written order denying Defendant's motion to dismiss. The trial was again continued four more days to allow Defendant's trial to proceed over three consecutive weekdays. Ultimately, the trial began on February 11, 2019, and concluded on February 14, 2019.

Defendant argues the Court of Criminal Appeals erred in holding that his constitutional right to a speedy trial was not violated. In determining whether a criminal defendant was denied a speedy trial, the court examines four factors: (1) the length of the delay; (2) the reason for the delay; (3) whether there was a demand for a speedy trial; and (4) the presence and extent of prejudice to the defendant. *Barker*, 407 U.S. at 530. We will analyze each factor in turn.

*(1) Length of Delay*

Defendant asserts that the pretrial delay in this case of little more than one year weighs in favor of dismissal, but he admits only "moderately so." The State submits that the trial was minimally delayed and that the length of the delay was "not egregious." Defendant was charged with four felonies in this case, including attempted first-degree murder. The trial itself required three days on the court's calendar and testimony from

multiple witnesses. The trial began less than fourteen months after the alleged crimes were committed and less than thirteen months after Defendant was served with the arrest warrant and transferred to a Tennessee jail. In light of the complex nature of this case, we agree with the Court of Criminal Appeals that the Defendant received his trial with "customary promptness" of Tennessee courts and that this factor weighs against Defendant's claim. *See Moon*, 2021 WL 531308, at *19-20.

*(2) Reason for Delay*

Defendant asserts that the delay was caused almost entirely by the government, which should weigh in favor of dismissal. The trial court acknowledged that the delay in this case was caused almost exclusively by the State, and the evidence does not preponderate otherwise. The only delay that appears to have been mutually agreed upon by the State and Defendant was at arraignment to allow time for discovery.

While we agree that the State was responsible for the majority of the (very brief) delays in this trial, Defendant has pointed to nothing in the record to support his assertion that the State's requests for delays were due to its "negligence or bureaucratic indifference." *See Doggett v. United States*, 505 U.S. 647, 657 (1992) (noting that negligence on the part of the government "falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun"). Defendant's trial date was initially set for November 28, 2018. The two continuances that followed delayed the trial only minimally and were to accommodate a rape trial in a significantly older case and to ensure that Defendant's case could be tried over three consecutive weekdays. We agree with the Court of Criminal Appeals that the reasons for delay were valid and reasonable. This factor also weighs against Defendant.

*(3) Defendant's Demand for a Speedy Trial*

The third factor contemplates that a defendant requested a speedy trial. *See State v. Berry*, 141 S.W.3d 549, 568-69 (Tenn. 2004). It is undisputed that Defendant requested a speedy trial in this case. We agree with the intermediate court that this factor weighs in Defendant's favor.

*(4) Prejudice to Defendant*

The State argues that Defendant can only show minimal prejudice, if any, as a result of the pretrial delay in this case. Defendant asserts he suffered prejudice in the form of pretrial anxiety and pretrial incarceration. There is no evidence in the record, however, that the circumstances of Defendant's pretrial incarceration were unusual or egregious. As the Court of Criminal Appeals has previously noted, pretrial "anxiety and concern are 'always present to some extent, and thus absent some unusual showing [are] not likely to be determinative in [a] defendant's favor.'" *State v. Hernandez*, No. M2016-02511-CCA-

R3-CD, 2019 WL 2150171 at \*40 (Tenn. Crim. App. May 15, 2019), *perm. app. denied*, (Tenn. Sept. 18, 2019) (alterations in original) (quoting 5 -Wayne Lafave, Criminal Procedure, § 18.2(e) (4th ed. 2017) (footnotes omitted)). Defendant was incarcerated for barely more than a year before his trial began. He points to no witnesses whose testimony he lost during that time nor to any other impairments in his ability to prepare a defense caused by the delay. In the absence of any discernable prejudice to Defendant, we determine that this factor also weighs against him.

In consideration of the foregoing, the only *Barker* factor that weighs in Defendant's favor is that he requested a speedy trial. Indeed, he received one. We agree, therefore, with the Court of Criminal Appeals that Defendant was not denied his constitutional right to a speedy trial.

### C. Impeachment of Defense Witness

Next, we consider Defendant's assertion that the Court of Criminal Appeals improperly conducted a harmless error analysis after concluding that the trial court erred in allowing the State to impeach defense witness Larry Woods by prior bad acts.

Larry Woods was called as a defense witness at trial. During cross-examination, the State sought to question him about his prior bad acts.[8] Mr. Woods was an employee at the trailer park where the incident occurred, and it was his trailer at which the incident took place. Mr. Woods had known Defendant for approximately twelve to thirteen years. During direct testimony, Mr. Woods testified that Defendant asked to use the restroom inside his residence, and Mr. Woods obliged. While Defendant was inside the trailer, Corporal Wilder pulled his car into the trailer park. Mr. Woods testified that he approached the Corporal's vehicle and asked if he could help him. Corporal Wilder responded that Mr. Woods had a lot of people in his yard that day. Mr. Woods said he did not see a problem with that and people were outside because the sun was out after a period of bad weather. Corporal Wilder asked Mr. Woods if he could speak with Defendant. Mr. Woods found Defendant in the trailer and told him that the Corporal would like to speak with him. Thereafter, Mr. Woods continued looking for something in his yard, and Defendant emerged from the trailer.

Continuing his direct testimony, Mr. Woods stated that Defendant was not upset or cursing during the ensuing conversation between Corporal Wilder and Defendant. This directly contradicted Corporal Wilder's testimony. At some point during the conversation, Defendant asked Corporal Wilder if he could have a beer. Another man who was present during the incident gave a beer to Defendant, and Corporal Wilder did not respond to

---

[8] To clarify, Larry Woods' son, Donald Woods, was also a defense witness at trial. By "Mr. Woods," we refer to Larry Woods, whose testimony was most relevant to the issues presented on appeal.

Defendant's drinking a beer. Mr. Woods testified that he never heard Corporal Wilder mention Defendant being under arrest and he never heard Defendant say he would not allow Corporal Wilder to arrest him.

Defense counsel asked Mr. Woods what led Corporal Wilder to "put his hands on" Defendant. Mr. Woods responded that he did not know but heard Defendant say "Why have you got to be like that?" and Corporal Wilder say "Stop, or I'm going to taze you." Mr. Woods testified that Corporal Wilder then "jumped back and shot" Defendant. Defendant fell off the stairs he was standing on and was lying on the ground on his back. Throughout his testimony, Mr. Woods unequivocally maintained that he did not see Defendant with a gun during the altercation. When asked whether he would have been able to see a gun if Defendant was holding one, Mr. Wilder stated: "I was three feet away. I stepped back around where I could see, you know. If he would have had a gun, I would have seen the gun. I didn't see no gun." According to Mr. Woods, after shooting Defendant, Corporal Wilder turned the gun on Mr. Woods. Mr. Woods testified that he put his hands up. Mr. Woods did not see a gun on the ground near Defendant. After the shooting, officers found it and kicked it out from under Defendant.

On cross-examination, without any apparent foundation, the State very quickly began to question Mr. Woods about whether he sold methamphetamine out of his trailer. Defense counsel objected to the line of questioning and the court excused the jury. The court conducted a jury-out hearing, during which defense counsel argued that the State had no basis to pursue this line of questioning. The State responded by saying that Mr. Woods had been indicted for selling drugs to a confidential informant three months prior to the incident at issue. According to the State, the evidence that Mr. Woods sold methamphetamine showed Mr. Woods "ha[d] motivation not to be completely honest with what happened that day." The State insisted that "the fact that [Mr. Woods] is a drug dealer selling drugs from that location would suggest maybe he is not going to be fully cooperative with police." Without any additional proof, the trial court found the evidence relevant and that any potential unfair prejudice was outweighed by the probative value. The State then introduced the indictments against Mr. Woods for identification purposes only – not as evidence. The trial court warned Mr. Woods about implicating himself in a crime and recessed for the day to allow Mr. Woods to consult with counsel.[9]

When trial resumed the next morning, defense counsel renewed his objection to the questioning of Mr. Woods. The trial court once again overruled the objection, finding that the allegation that Mr. Woods was selling drugs was probative "as it gives a complete story of motivation[ ], bias, and other things that involve witnesses and a complete story of the crime." The jury returned to the courtroom, and as the prosecution resumed its questioning,

---

[9] The same warning was extended to Mr. Woods' son who, as noted above, was also a defense witness.

Mr. Woods invoked his Fifth Amendment privilege against self-incrimination regarding the indicted drug sales. Later in the trial after Defendant's testimony, the trial court returned to its earlier ruling concerning Mr. Woods' drug charges and noted that his prior bad acts had been proven by clear and convincing evidence.

Tennessee Rule of Evidence Rule 404(b) states as follows:

**(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

We note that Rule 404(b) has been held to only apply to criminal defendants. *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002). However, the unusual 404(b) type of evidence at issue here falls under Tennessee Code Annotated section 24-7-125 (2017), which is essentially identical to Rule 404(b) except for the following language of the statute: "[i]n a criminal case, evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual, including a deceased victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait." Tenn. Code Ann. § 24-7-125 (known as the "Channon Christian Act" which expanded Rule 404(b)'s protections to all witnesses in a criminal case).[10] Thus, section 24-7-125 makes Mr. Woods, as a witness, within the scope of people against whom this evidence is to be excluded.

---

[10] We note that whether the statutory extension of Rule 404(b) by and through the Channon Christian Act is constitutional is not at issue in this case, and our holding does not attempt to answer that question as it has not been raised by either party.

Obviously, the type of evidence the State successfully sought to admit against Mr. Woods falls squarely within the scope of evidence excluded by Rule 404(b) and section 24-7-125. The State was attempting to prove Mr. Woods was of bad character in order to show he was acting in conformity therewith when testifying. The Court of Criminal Appeals provided a lengthy and thorough examination of precisely why the questioning of Mr. Woods was in error. It concluded that the trial court's decision to allow the State to cross-examine the witness regarding prior bad acts violated Tennessee Rule of Evidence 404(b) because the prior bad acts had not been proven by clear and convincing evidence, the evidence was not relevant to any material issue, the evidence was not admissible to give the "complete story," and the evidence could not be used to establish bias. *Moon*, 2021 WL 531308, at *13-*14.[11] Indeed, neither party appears to take issue with this portion of the Court of Criminal Appeals' holding.

Defendant instead argues that the Court of Criminal Appeals improperly determined that the trial court's error was harmless. As this Court has previously explained:

> The harmlessness of non-constitutional errors is analyzed using the framework provided by [Tennessee Rule of Appellate Procedure] 36(b). Where an error is not of a constitutional variety, Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error "more probably than not affected the judgment or would result in prejudice to the judicial process."

*State v. Rodriguez*, 254 S.W.3d 361, 371-72 (Tenn. 2008) (citing Tenn. R. App. P. 36(b); *State v. Ely,* 48 S.W.3d 710, 725 (Tenn. 2001); *State v. Harris,* 989 S.W.2d at 315).

The intermediate appellate court did not discuss the issue at length—the entirety of the discussion and determination on that issue is set forth below:

---

[11] As for the standard of appellate review of this issue, this Court has previously explained that

> when we consider evidence that implicates Tenn. R. Evid. 404(b), we review the trial court's admissibility ruling de novo unless the trial court substantially complied with the procedures outlined in Rule 404(b). If the trial court substantially complied with Tenn. R. Evid. 404(b), we will overturn the ruling only if the trial court abused its discretion.

*State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) (citing *State v. Kiser*, 284 S.W.3d 227, 288-89 (Tenn. 2009); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). Here, the Court of Criminal Appeals concluded that the trial court did not state on the record at the time of its 404(b) hearing and ruling that it found the prior bad acts of Mr. Woods were established by clear and convincing evidence and thereby failed to substantially comply with the procedural requirements of Rule 404(b). The intermediate court, therefore, reviewed the trial court's decision de novo. Again, this issue has not been raised by either party on appeal.

While the trial court's admission of Mr. Larry Woods's prior bad acts was error, we nevertheless conclude that the error was harmless. Mr. Larry Woods's testimony was improperly impeached by the admission of prior bad acts; however, Mr. Donald Woods, J.J., and Defendant all testified to virtually the same sequence of events as Mr. Larry Woods. Mr. Donald Woods and J.J. both testified that they did not see Defendant with a gun in his hand and that [Corporal] Wilder shot Defendant within seconds of removing his hand from Defendant's face or neck. Defendant said that he did not pull a gun on [Corporal] Wilder. Each of the eyewitnesses gave far more information under oath at trial than they did in their statements to police, and the jury was free to conclude their testimonies were suspect. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (stating that the credibility of witnesses is resolved by the fact finder). The jury clearly rejected Defendant's and the eyewitnesses' accounts and accredited [Corporal] Wilder's account that Defendant pointed a gun at [Corporal] Wilder and pulled the trigger. Thus, the error was harmless.

*Moon*, 2021 WL 531308, at *15.

While we agree with the Court of Criminal Appeals that the improper impeachment of Mr. Woods was error, we are inclined to disagree with its harmless error analysis. The improper impeachment evidence arguably sullied the reputations of multiple defense witnesses—not just that of Mr. Woods—by emphasizing the witnesses' association with the alleged drug dealer and their proximity to his trailer. The "drug dealer" evidence was presented by the prosecution multiple times and in the questioning of three different witnesses. Initially, it was introduced as evidence of Mr. Woods' actions/character. It was also included in the prosecution's cross-examination of Defendant himself. The evidence was again repeated in the cross-examination of Mr. Woods' son. *See Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976) (noting that the length and repeated nature of improper remarks by a prosecutor can impact whether they were indeed harmful).

In our view, the evidence used to convict Defendant was not overwhelming. Four eyewitnesses in close proximity to the incident testified that they never saw Defendant holding a gun. This includes Detective Pyrdom, one of Corporal Wilder's fellow officers. It also includes Larry Woods, Donald Woods (Larry Woods' son), and J.J. (another defense witness). This does not include Defendant himself who obviously denied he wielded a gun, stating that his gun remained in his pants and he never pulled it out. "[T]he line between harmless and prejudicial error is in direct proportion to the degree by which the proof exceeds the standard required to convict." *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003) (internal citation omitted). And again, the State's proof was not overwhelming. Corporal Wilder himself—who, as Defendant points out in his brief, arguably had ample reasons to assert Defendant drew a gun—was the only witness to say Defendant used a gun

or otherwise struggled against him during their encounter. On the other hand, Defendant presented multiple witnesses who gave consistent accounts undermining Corporal Wilder's testimony. In the end, the jury viewed all of the witnesses and chose to accredit Corporal Wilder's version of events, but it is extremely difficult to assess the impact the improper impeachment may have had on the verdict under these particular circumstances.

In sum, we agree with Defendant that the evidence of bad acts against Mr. Woods was not trivial or harmless. We conclude that the improper impeachment of defense witness Larry Woods more probably than not affected the judgment, and thus, the trial court committed reversible error.

## III. CONCLUSION

We hold that the standard of review for whether a criminal defendant was denied the constitutional right to a speedy trial is de novo with deference to the trial court's finding of facts unless the evidence preponderates otherwise. Under this standard, Defendant's right to a speedy trial was not violated. However, allowing impeachment evidence of a material defense witness without sufficient evidence and findings to support its admission constitutes reversible error in this case. Therefore, the judgment of the Court of Criminal Appeals is reversed and the judgments of the trial court are vacated. We remand to the trial court for proceedings consistent with this opinion. The costs of this appeal are taxed to the State of Tennessee.

_____
ROGER A. PAGE, CHIEF JUSTICE